UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE:

| | | |
|---|---|---|
| KMART CORPORATION, | ) | |
| | ) | |
| Debtor, | ) | No. 03 C 8625 |
| | ) | Bankruptcy No. 02 B02474 |
| v. | ) | |
| | ) | |
| CAPITAL ONE BANK, CAPITAL ONE F.S.B., | ) | Judge Rebecca R. Pallmeyer |
| AND CAPITAL ONE SERVICES, INC., | ) | |
| | ) | |
| Appellants, | ) | |
| v. | ) | Appeal from The Honorable |
| | ) | Susan Pierson Sonderby, United |
| KMART CORPORATION. | ) | States Bankruptcy Judge |
| | ) | |
| Appellee | ) | |

## MEMORANDUM OPINION AND ORDER

In May 2000, Kmart Corporation ("Kmart") entered into an agreement with Capital One Bank and its affiliates to develop and distribute a co-branded bank credit card. Early in 2002, before the cards had been issued, Kmart filed for reorganization under the Bankruptcy Code (the "Code"). Now a debtor in bankruptcy, Kmart seeks to assume the executory contract pursuant to 11 U.S.C. § 365(a) of the Code, which permits such assumption unless the debtor is in default on the contract. Appellants Capital One Bank, Capital One F.S.B., and Capital One Services, Inc. (together "Capital One") object to the proposed assumption, asserting that the Agreement was rendered unassumable by Kmart's incurable defaults. Bankruptcy Judge Sonderby overruled the objection and Capital One appeals, arguing that Judge Sonderby improperly excluded extrinsic evidence that Kmart breached the Agreement and erred in concluding that Kmart's loss of market share and failure to staff the

project constituted an incurable breach of the Agreement. For the reasons explained below, the court affirms.

## BACKGROUND

### Contract Negotiations

In November 1999, Kmart and Capital One engaged in preliminary talks concerning the possibility of their developing a co-branded credit card program.[1] Formal negotiations began in March 2000 (Appellants' Excepts of the Record, hereinafter E.R., at 255) and culminated in the signing of a Credit Card Co-Brand and Finance Agreement on May 4, 2000. (Id. at 458-91.) The Agreement calls for Capital One to market, issue, and service credit cards bearing the Kmart name to Kmart customers. (Id. at 636.) Under the Agreement, Capital One pays certain fees to Kmart, in return for revenue generated by the cards through discounts on sales drafts submitted to Capital One and other charges to Kmart customers. (Id.) Kmart in turn expects to benefit from the additional sales generated by the program. (Id.) The Agreement has a five-year term, renewable for successive one-year terms.

During the preliminary talks and negotiations, Capital One asserts, Kmart made certain representations, including that: (1) Kmart had more than 2,100 stores; (2) Kmart stores are located within five to six miles of 95 percent of the United States population; and (3) 90 percent or more of United States households had shopped at Kmart in the previous year. (Id. at 256.) Capital One officials maintain that they considered Kmart's massive level of market penetration to be pivotal in forging a co-branded card program and that "had these figures been even slightly lower, [they] would

---

[1]       In a co-branded credit card program, the names of both the retailer and the credit card issuer appear on the card.

not have agreed to the terms of the Agreement . . ." (Appellants' Brief, at 6 (citing E.R. at 267-68).)[2] As evidence of its importance, Capital One points to one of the two recitals to the Agreement, which states: "WHEREAS, Kmart owns and operates a chain of discount retail stores and is a mass market merchandise retailer." (E.R. at 459.) According to Capital One, this recital and especially the use of the term *mass market merchandise retailer* "stresses the importance to Capital One of Kmart's market penetration information supplied . . . during the preliminary discussions and negotiations . . . ." (Appellants' Brief, at 7.)

Kmart disputes any contention that the Agreement requires Kmart to be or remain a mass market merchandise retailer, to maintain a particular number of stores, or retain a certain market presence. (Appellee's Brief, at 5.) It notes that the only mention of "mass merchandiser" in the Agreement appears in the recitals in the preamble, where Kmart is simply identified as a mass market retailer "by way of introduction." (*Id.*) Furthermore, Kmart stresses that Capital One admitted that the Agreement contains no size or market presence requirement, and that despite the fact that such an agreement could have been negotiated, at no point during the negotiations, which included ten to fifteen draft agreements, did Capital One's representatives request such a provision. (*Id.* at 6.)

The parties signed the Agreement on May 4, 2000.[3] (E.R. at 458-91.) Section 2.6 of the

---

[2]     Capital One claims that this "testimony about the role of Kmart's size and market penetration in the negotiation of the Agreement is undisputed." (Appellants' Brief, at 7.) Kmart responds that this is a "mischaracterization," but that Kmart did not seek to contradict this testimony because such evidence "was legally irrelevant given the Agreement's integration clause." (Appellee's Brief, at 5.)

[3]     The Agreement itself runs 16 pages, and is followed by an additional 16 pages of exhibits. Scott Barton signed the agreement on behalf of Capital One, and M.E. Welch signed on behalf of Kmart. (E.R. at 474.) As of the bankruptcy hearing, Scott Barton was the Vice President
(continued...)

Agreement provides for the creation of an Executive Committee responsible for setting strategic and budgetary policy, and f or general oversight and review of the program (*Id.* at 461), and a Management Team responsible for executing these policy directives by managing the day-to-day operations of the program. (*Id.* at 462.) Capital One contends that, given the important responsibilities of the Executive Committee and the Management Team (together, the "Committees"), the qualifications of the personnel to be appointed "are implicit in the duties the Agreement sets forth for those personnel . . . in section 2.6." (Appellants' Brief, at 9-10.) Kmart notes, however, that the Agreement itself "does not require that the members of the Executive Committee or the Management Team possess any particular qualifications or experience." (Appellee's Brief, at 9.) Furthermore, section 2.6 explicitly states: "Either party may remove or replace, with or without cause, any member of the [Executive Committee or Management Team] appointed by such party." (E.R. at 461-62, § 2.6(a)-(b).) The Agreement contains no notice requirement for unilateral changes in the composition of the Committees.

In any event, both parties agree that the original Committees were staffed with well-qualified representatives from both Capital One and Kmart, and that all vacancies arising prior to January 2002 were filled with qualified representatives. (Appellants' Brief, at 12; Appellee's Brief, at 9.)

**Kmart's Bankruptcy Filing**

On January 22, 2002, Kmart and a number of its affiliates filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code. (E.R. at 634-35.) Prior to

---

[3](...continued)
of Fund Operations for Capital One. (E.R. at 249.) The record does not reflect Welch's position at Kmart.

filing for bankruptcy protection, a corporate reorganization had reduced Kmart's market presence from having stores within five or six miles of 95 percent of the population to having stores within fifteen miles of 81 percent of the population. (*Id.* at 129.) The percentage of United States households that had shopped at Kmart in the previous twelve months similarly fell from 90 percent to 75 percent. (*Id.* at 130.) The store closures continued after the Chapter 11 filing, with Kmart closing a total of 600 stores, reducing its total from 2,114 at the date of filing to 1,514 as of February 2003. (*Id.* at 33.) Despite these closures, at the time of the bankruptcy hearing Kmart remained the tenth largest retailer of any type in the United States, registering one billion register transactions totaling approximately $25 billion in sales for the fiscal year ending January 2003.[4] (*Id.* at 130, 141.)

During the summer and fall of 2002, representatives from Capital One and Kmart discussed the marketing objectives of their joint credit card effort. (*Id.* at 357.) The parties initially disagreed over whether to focus on generating the highest possible number of new accounts or on only those potential customers with higher-quality credit. (*Id.* at 322.) By November, the parties had agreed to seek a balanced portfolio including both so-called "prime" and "subprime" customers.[5] (*Id.* at 363-64.) By November or December of 2002, the parties began preparation for a marketing plan targeting the back-to-school season for 2003. (*Id.* at 369.) Capital One representatives presented preliminary proposals and ideas for the marketing plan at a meeting on December 9, 2002. (*Id.* at

---

[4]     The proceedings in bankruptcy court and briefing in this court preceded Kmart's widely-reported November 2004 agreement to purchase Sears. *See, e.g.,* http://www.msnbc.msn.com/id/6509683/.

[5]     "Prime" creditors are those with higher-quality credit ratings, while "subprime" customers, who make up the majority of Kmart customers, have lesser credit ratings. (E.R. at 357.) The parties do not indicate whether their agreement to seek a "balanced" portfolio included a specific percentage of prime and subprime customers.

495-504.) They made another presentation on January 8, 2003. (*Id.* at 505-33.) During this meeting, Capital One representatives expressed concern about Kmart's store closings and their effect on the marketing program. (*Id.* at 506, 369-70.) Following the meeting, Kmart's representative agreed to discuss the results of the meeting with Steve Feuling, a Kmart representative on the Executive Committee, to verify that he had their commitment to proceed with the next level of planning. (*Id.* at 372.) At some point after the January 8 meeting, Kmart executives reaffirmed their intent to go ahead with the marketing plan and scheduled another meeting with Capital One representatives for February 27, 2003. (*Id.* at 372.)

## Plan of Reorganization and Subsequent Negotiation

On January 24, 2003, Kmart filed a proposed plan of reorganization. This plan was amended on February 23, 2003 to become the First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated Debtors and Debtors in Possession (the "Plan"). Under Article 8.1(c) and Schedule L-3 of the Plan, Kmart sought to assume the Agreement pursuant to Code sections 365(a) and 1123(b)(2). (E.R. at 25-26.)

At the previously scheduled February 27 meeting, Capital One representatives expressed their concern that they needed to begin work quickly in order to be ready for the upcoming back-to-school season. (*Id.* at 374.) A Kmart representative, Charles Pascalar, agreed to meet with Feuling and obtain his final approval for the plan within a week. (*Id.*)

Pascalar was unable to meet with Feuling that next week, however. (E.R. at 374.) Indeed, Capital One's representatives did not hear back from Kmart's representatives until mid-March, when

6

Pascalar informed them that he and Feuling had been laid off.[6] (*Id.* at 374-75.) On learning of Pascalar's and Feuling's departures, Capital One representatives contacted Julie Leyda-Rybicki, the remaining member of the Kmart team, and attempted to move forward with the plan. (*Id.* at 375-77.) Leyda-Rybicki had not, however, attended any of the three meetings of Kmart and Capital One between December 2002 through February 2003. (*Id.* at 363, 366-68, 372.) Moreover, according to Capital One's representatives, she had no decision-making authority. (*Id.* at 376.) Kmart denies this latter allegation, but the testimony it cites, that of Capital One's Douglas Pick, acknowledges only that Leyda-Rybicki had done "great work with implementation and execution." (*Id.* at 423.)

The two parties met again on April 30, 2003. (E.R. at 377.) In addition to Leyda-Rybicki, Kmart sent four new representatives: Tom Zielecki, Joy Corneliussen, Barbara Firment, and Bill Crowley. (*Id.* at 378.) None of these individuals had any previous experience with credit cards, although some had experience working with gift cards. (*Id.* at 156-58, 147-48.) Similarly, James Gooch, whom Kmart's CEO had directed to oversee the company's relationship with Capital One, also lacked professional experience with credit cards. (*Id.* at 107-08, 147.)

During the April 30 meeting, Bill Crowley, one of Kmart's new representatives, reiterated Kmart's interest in going forward with the Agreement, but stated that he wanted to start with a "clean slate." (E.R. at 379.) In response, Capital One representatives made clear that much planning had already been done and expressed some frustration about the fact that Kmart's new representatives were uninformed about the program. (*Id.* at 381.) Joy Corneliussen admitted to

---

[6]     Pascalar contacted a Capital One Representative in mid-March to advise that both he and Feuling had been laid off that very day and that he did not know what the future of the Agreement was, nor who would replace him and Feuling. (E.R. at 374-75.)

Capital One representatives that she and other Kmart representatives were not yet up to speed on the project. (*Id.* at 380-81) To remedy this, Crowley asked Capital One to send him materials related to the earlier planning efforts and suggested that they schedule two follow-up meetings: one involving him and Capital One's representatives and another meeting involving the all Kmart and Capital One officials involved in the credit card program. (*Id.* at 380.)

This first meeting never occurred because, according to the testimony of Capital One representatives, Crowley never returned their calls to schedule it. (E.R. at 381-82.) The second, full meeting between Capital One and Kmart representatives occurred on June 9, 2003. (*Id.* at 383-84.) Present at that meeting on behalf of Kmart were Crowley, Corneliussen, Zielecki, and a Ms. Younglove. (*Id.* at 384.) Firment had been laid off in the period between April 30 and June 9 and was replaced by Karen Allen, Kmart's Senior Vice President of Advertising, who was also present at the meeting. (*Id.* at 184, 109.) Leyda-Rybicki had also left the company since April 30. (*Id.*)

At the June 9 meeting, Capital One representatives expressed some concern over the future of the program, "tried to lay out . . . the universe of possibilities" for the program, and stated that, although they still wished to continue the program, if certain criteria were not met, Capital One might seek to end the relationship. (E.R. at 385-86.) Capital One representatives noted their concerns regarding Kmart's lack of management and involvement in the project. (*Id.* at 386-87.) Discussing an advertisement that Kmart had placed,[7] looking for a manager with credit card

---

[7] Joy Corneliussen testified during that bankruptcy hearing that an advertisement was posted on Monster.com sometime around the end of June 2003. (E.R. at 215.) The exact language and details of this advertisement are not found in the record. In her opinion, Judge Sonderby stated that at the time of the court's ruling Kmart was "actively seeking to hire someone with credit card experience to serve on the Management Committee and work exclusively with the Capital One
(continued...)

8

experience, Pick stated: "This is a good start. But you can't replace Chuck Pascalar with someone who has three years' experience. It's complex. It's a lot. These meetings are getting nowhere. We need you to make decisions to give us a counterproposal [in response to Capital One's initial proposal presented on December 9, 2002." (*Id.* at 387.) Kmart representatives themselves questioned whether the program was worth pursuing, with Allen ultimately asking Zielecki during the meeting to prepare an analysis of what the program was worth to Kmart. (*Id.* at 386-87.) Crowley also asked Capital One to prepare a proposed marketing budget for the current year as well as a buyout analysis if the parties decided not to pursue the program thereafter.[8] (*Id.* at 388.) Pick refused, on behalf of Capital One, to calculate both valuations, insisting that if Kmart wanted to end the relationship, it do so before Capital One made any further expenditures. (*Id.*)

Representatives of Capital One and Kmart had little further contact after this meeting. Although Gooch discussed the buyout proposal and marketing proposal with Pick, these discussions did not lead anywhere prior to the hearing on this matter in bankruptcy court. (E.R. at 389-91.) By the time of the hearing in August 2003, Kmart had not responded to any of Capital One's marketing proposals, nor made any proposals of its own, since Feuling and Pascalar were laid off in mid-March 2003. (*Id.* at 227-28, 390-91.)

---

[7](...continued)
program." (E.R. at 658.)

[8]      The record does not reflect which party would be buying out whom. Presumably Kmart would buy out of the contract with Capital One, as the latter had already made some investment in the program and its representatives had expressed frustration with Kmart's refusal to begin making similar investments on their end.

**Capital One's Objection**

On April 3, 2003, Capital One filed and served an Objection to Kmart's proposed assumption of the Agreement. In the Objection, Capital One argued that Kmart had defaulted under the Agreement and that those defaults were incurable. (E.R. at 642.) Specifically, Capital One argued that the deterioration of Kmart's market presence frustrated the purpose of the Agreement, thereby relieving Capital One of any further obligations under the Agreement. They also argued that Kmart is in default because the initial members of the Executive Committee and Management Team appointed by Kmart had been replaced by personnel who lacked the requisite authority in the Kmart organization and lacked the background and knowledge in co-branded credit card arrangements necessary to implement the program. (Id. at 643.)

In response, Kmart observed that the express terms of the Agreement do not require Kmart to be a mass merchandiser or to maintain a certain number of stores or level or market penetration. (E.R. at 643-44.) Kmart also stressed that the Agreement does not require the members of the Executive Committee and Management Team to possess a minimal level of expertise or experience. (Id.) Rather, the composition of the Committees is entirely within the discretion of each company. (Id.) Any evidence concerning assumptions and expectations not set forth in the Agreement are inadmissible, Kmart contends. In any event, Kmart urges that its representatives on the Committees did have the authority and experience necessary to successfully develop and implement the program. (Id. at 656-57.)

In its ruling on October 7, 2003, the bankruptcy court concluded that the Agreement is unambiguous and refused to admit extrinsic evidence, which the court noted "would primarily

consist of Capital One's self-serving testimony anyway," to establish ambiguity. (E.R. at 652.) The court held, further, that even if extrinsic evidence were admitted, such evidence would not establish an incurable default. (Id. at 653.) Kmart was in the process of curing any default arising from the composition of Kmart's representatives on the Committees "by actively searching to hire someone with credit card experience to serve on the Management Committee and work exclusively with the Capital One program." (Id. at 658.) In fact, the court noted that Kmart might have already cured by changing the composition of the Committees after the departure of Leyda-Rybicki. (Id. at 659.) Capital One now appeals the bankruptcy court's ruling.

## DISCUSSION

Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume an executory contract, subject to court approval. 11 U.S.C. § 365(a). A debtor in possession may not, however, assume an executory contract on which the debtor has defaulted unless, at the time of assumption, the debtor cures or provides adequate assurance that it will promptly cure such default and provides adequate assurance of future performance under the lease. Id. § 365(b)(1)(A), (b)(1)(C); In re United Airlines, Inc., 368 F.3d 720, 725-26 (7th Cir. 2004). The purpose of these requirements is to ensure that the nondebtor receives the full benefit of the contract if forced by a court to continue performing with a bankrupt debtor. Matter of Superior Toy & Mfg. Co., 78 F.3d 1169, 1174 (7th Cir. 1996).

These requirements apply only if there has been a default. In re UAL Corp., 293 B.R. 183, 190 (Bankr. N.D. Ill. 2003). Capital One claims that Kmart is in default because, (a) due to the decline in the number of store it owns, Kmart is no longer a "mass merchandise retailer" as described in the Agreement; and (b) Kmart appointed personnel who lacked experience with credit cards and lacked

11

the authority to carry out the credit card marketing plan on behalf of Kmart. Overruling these objections, the bankruptcy court held that the reference to Kmart as a "mass merchandise retailer" was a "whereas clause," serving as a mere recital explaining the circumstances surrounding the execution of the contract, and did not create a binding obligation on Kmart to maintain a certain market presence of number of stores. (*Id.* at 645-47.) Thus, the court held, Capital One did not establish that Kmart had frustrated the purpose of the Agreement by failing to maintain its existing number of stores and level of market penetration. The court noted that Capital One failed to present evidence that the store closures were not reasonably foreseeable. (*Id.* at 648.) Further, the court noted that there was no evidence that the store closures had totally or almost totally destroyed the parties' ability to perform under the Agreement. (*Id.*) In response to Capital One's claim that Kmart violated the Agreement by appointing to the Committees personnel lacking the requisite experience and authority, the court held that there had been no such breach, as the Agreement contained no criteria for membership on the Committees.

In rejecting Capital One's claims, the bankruptcy court refused to consider extrinsic evidence as to the meaning of the phrase "mass merchandise retailer" or to show that the Agreement contained implicit requirements as to the qualifications of each party's representatives on the Committees. (*Id.* at 645, 650.) Noting the existence of a merger clause in the Agreement, the bankruptcy court held that there is no ambiguity in the Agreement, and that the parol evidence rule prohibited the admission of extrinsic evidence to establish such an ambiguity. (*Id.* at 652.) Moreover, the court stated, even if such evidence were admitted, "the court would conclude that there is no incurable default" because Kmart had taken steps to hire someone with expertise in co-branded credit cards. (*Id.* at 653.)

12

Capital One now appeals both of these conclusions. In addition, Capital One argues that Kmart failed to perform under the Agreement beginning in March 2003, and created incurable defaults by failing to participate in the management and administration of the Agreement and that Kmart's breach of section 2.6 of the Agreement (discussing Committee membership) amounted to a breach of the implied covenant of good faith and fair dealing. The court will examine these issues in turn.

## I. Jurisdiction and Standard of Review

This court has subject matter jurisdiction over appeals from the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1), which grants jurisdiction over appeals from "final judgments, orders and decrees" of the bankruptcy court. *In re Allied Products Corp.*, 2004 WL 635212 (N.D. Ill. 2004). On appeal, the district court reviews the bankruptcy court's findings of fact for clear error, *Dye v. United States*, 360 F.3d 744, 747 (7th Cir. 2004) (citing *In re Generes*, 69 F.3d 821, 824-25 (7th Cir. 1995)), and reviews legal conclusions *de novo. Id.* (citing *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994)).

## II. Waiver

As an initial matter, Kmart asserts that Capital One raises three issues on appeal to this court that were not raised in its original objection to the assumption (on April 4, 2003) nor in the bankruptcy court proceedings. (Appellee's Brief, at 12.) These theories, as Kmart defines them, are that: (1) Kmart defaulted by failing to perform the Agreement after March 2003; (2) the default of Section 2.6 amounted to breach of the covenant of good faith and fair dealing; and (3) "the parties' alleged 'course of dealing' waived or modified Kmart's rights under the plain language of Section 2.6." (*Id.*) Kmart asserts that these theories have been waived and are not properly before the court. Of

13

course, it is "axiomatic" that issues not first presented below are waived on appeal. *Hutzinger v. Hasting Mut. Ins. Co.*, 143 F.3d 302, 307 (7th Cir. 1998) (quoting *Christmas v. Sanders*, 759 F.2d 1284, 1291 (7th Cir. 1985)). This rule is not meant "to punish careless litigators," but rather to maintain the "efficiency, fairness, and integrity of the judicial system for all parties." *Boyers v. Texaco Ref. & Mktg., Inc.*, 848 F.2d 809, 812 (7th Cir. 1998).

Capital One concedes that it did not raise these matters explicitly, but disputes the contention that these issues were not raised in any fashion before the bankruptcy court. (Appellants' Reply Brief, at 4, 9.) In its Objection to the original assumption of the Agreement, Capital One alleged that Kmart had defaulted by failing to staff the Committees with individuals meeting certain qualifications as required by section 2.6 of the Agreement. (E.R. at 56-57.) The arguments Capital One makes before the court also focus on section 2.6 of the Agreement; specifically, Capital One now claims that in breaching section 2.6, Kmart violated the covenant of good faith and fair dealing implied in the Agreement.[9] (Appellants' Brief, at 31-33.) Capital One also claims that Kmart failed to perform under the Agreement beginning in March 2003 when, in addition to replacing its original representatives to the Committees, it failed to actively engage in negotiations and planning. (*Id.* at 35-36.)

The court agrees that Capital One's failure to expressly raise the "good faith and fair dealing" argument in its objection and at the bankruptcy hearing precludes it from doing so here. Although

---

[9]    Kmart also contends that Capital One raises a claim "that the parties' alleged 'course of dealing' waived or modified Kmart's rights under the plain language of Section 2.6." (Appellee's Brief, at 12.) While Capital One does raise this point, it does so as a part of its claim that Kmart breached the implied covenant of good faith and fair dealing, not as a separate claim. (Appellants' Brief, at 33.) For this reason, the court will examine the these two issues together for purposes of the waiver analysis.

Capital One raised the issue of nonperformance, it previously claimed that Kmart violated explicit contractual language (mainly Section 2.6). At no point before this appeal did Capital One suggest that Kmart's inadequate performance constituted a violation of the implied covenant of good faith and fair dealing. In the Seventh Circuit, "arguments not presented to the trial court are waived and cannot be raised for the first time on appeal." *Matter of Kroner*, 953 F.2d 317, 319 (7th Cir. 1992). Capital One's citation of *U.S. for the Use and Benefit of H & S Indus., Inc. v. F.D. Rich Co.*, 525 F.2d 760 (7th Cir. 1975), is of no avail. *F.D. Rich* held that in a contract interpretation matter, the failure to cite the specific contractual provision did not constitute a waiver. *Id.* at 766. In saying this, however, the court was merely stressing that the "contract must be read as a whole." *Id.* In other words, an appellant is not barred from pointing to, nor a court from considering, certain contractual provisions on appeal merely because those provisions were not specifically mentioned in the complaint or at trial. *F.D. Rich* did not involve any reference to a "good faith and fair dealing" obligation, nor any other quasi-contractual theories.

By alleging a breach of the implied covenant of good faith and fair dealing, Capital One is not seeking to address the contract as a whole. Indeed, under Illinois law, the implied covenant of good faith and fair dealing is not an independent source of duties for parties to a contract. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992) (citing Illinois cases). It is instead an implied term that "guides the construction of explicit terms in an agreement." *Id.* To the extent that Capital One's reference to "good faith and fair dealing" is something more than simply another way of saying that Kmart violated section 2.6 of the Agreement, the argument is waived. *Teumer v. General Motors Corp.*, 34 F.3d 542, 546 (7th Cir. 1994) (citations omitted) ("The failure to draw the district court's attention to an applicable legal theory waives pursuit of that theory in this court."). Similarly,

15

Capital One's claim that Kmart breached the Agreement generally by failing to actively engage in planning and carrying out the program also represents a new legal theory of breach that had not been articulated in the original Objection nor presented at the hearing. The issue is waived. Finally, as noted, Capital One raised its "course of dealing" argument for the first time as a part of the "good faith and fair dealing" argument. That claim, too, is waived.

III.    "Mass Merchandise Retailer"

Capital One does not challenge Judge Sonderby's determination that the whereas clause in which the term "mass merchandiser" appears in the Agreement serves as a recital, merely explaining the circumstances surrounding the execution of the contract without creating any obligations on the parties. (E.R. at 646 (citing *Regenery v. Meyers*, 287 Ill. App. 3d 354, 679 N.E.2d 74 (1st Dist. 1997).) Capital One does, however, dispute the bankruptcy court's refusal to consider extrinsic evidence that Capital One contends shows that the parties intended for Kmart to be contractually bound to maintain that status. According to Capital One, Kmart lost its status as a mass merchandiser through its store closings, thereby frustrating the purpose of the Agreement.

Under Illinois law,[10] "[i]t is well settled that a court, when construing a contract, should ascertain the intent of the parties and give effect to that intent." *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 520, 757 N.E.2d 952, 956 (1st Dist. 2001) (citing *In re Marriage of Olsen*, 124 Ill. 2d 19, 25-26, 528 N.E.2d 684, 687 (1988)); *see also Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated*

---

[10]    The bankruptcy court held that Illinois law governs, noting that the Agreement had no choice of law provision and that the parties did not brief the issue. (E.R. at 645 (citing *ECHO, Inc. v. Whitson Co.*, 52 F.3d 702, 707 (7th Cir. 1995) ("Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.").)

*Dough Prods., Inc.*, 212 F.3d 373, 380 (7th Cir. 2000). Thus, an "agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003) (citing *Western Ill. Oil Co. v. Thompson*, 26 Ill. 2d 287, 291, 186 N.E.2d 285, 287 (1962)). Specifically, the parol evidence rule precludes the admission of unwritten understandings, reached before the execution of the contract, that would alter or modify its terms. *Krautsack v. Anderson*, 329 Ill. App. 3d 666, 680, 768 N.E.2d 133, 146 (1st Dist. 2002); *Sunstream Jet Exp., Inc. v. International Air Service Co., Ltd.*, 734 F.2d 1258, 1267 (7th Cir. 1984). The lone exception to this prohibition of extrinsic evidence allows the admission of such evidence to show additional consistent terms of the contract if the writing is "incomplete or ambiguous," that is, not a total integration of the parties' agreements. *Id.* (quoting *Eichengreen*, 325 Ill. App. 3d at 522, 757 N.E.2d at 956). Furthermore, under the Illinois "four corners rule," any ambiguity must be present in the actual terms of the contract, without the provisional admission of extrinsic evidence. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 706 N.E.2d 882 (1999); *see also Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998).

As to the matter of integration, the Illinois courts have held that the presence of an integration clause "is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement." *Air Safety, Inc.*, 185 Ill. 2d at 465, 706 N.E. 2d at 886. Section 13.8 of the Agreement at issue here states:

> This Agreement together with the Confidentiality Agreement, including the Exhibits attached hereto and thereto, constitute the entire agreement between the parties hereto relating to the subject matter hereof, and all prior negotiations and understandings, whether

17

oral or written, are superseded hereby. No modification or amendment of this Agreement will be effective unless and until set forth in writing and signed by the parties hereto.

(E.R. at 472, § 13.8.) Despite this language, Capital One disputes the bankruptcy court's characterization of section 13.8 as an integration clause excluding any additional terms and agreements. Capital One relies on the phrase "to the subject matter thereof," and argues that this language limits the scope of the integration clause to those provisions contained in the Agreement. (Appellants' Brief, at 27-28.) Extrinsic evidence regarding matters not expressly addressed by the Agreement, according to Capital One, are not limited by this clause.

Capital One's interpretation of section 13.8 finds no support in case law. While Capital One is correct in its assertion that the integration clause present in *Air Safety* did not contain the "relating to" language found in section 13.8, the Illinois courts have on numerous occasions found that integration clauses including the phrase "relating to the subject matter hereof" indicate that the writing is a complete integration of the parties understanding. *See Pappas v. Waldron*, 323 Ill. App. 3d 330, 339, 751 N.E.2d 1276, 1283 (4th Dist. 2001) ("This [a]greement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements, and may be modified only by a written instrument executed by all parties."); *Suburban Ins. Services, Inc. v. Virginia Surety Co.*, 322 Ill. App. 3d 688, 691, 752 N.E.2d 15,18 (1st Dist. 2001) (enforcing integration clause declaring that the written contract "sets forth the entire understanding of the parties with regard to the subject matter hereof."); *SLF Ltd. Partnership v. Molecular Biosystems, Inc.*, No. 03 CV 9576, 2003 WL 22859394, at *11 (N.D. Ill. Dec. 2, 2003) (enforcing integration clause reading: "This Agreement embodies the entire understanding of the parties and shall supersede all previous communications, representations or understandings, either oral or written, between the

18

parties relating to the subject matter hereof."). In the lone case cited by Capital One for the proposition that such language limits the applicability of the integration clause, *Hartbarger v. SCA Services, Inc.*, 200 Ill. App. 3d 1000, 558 N.E.2d 596 (5th Dist. 1990), the court admitted extrinsic evidence to show the existence of a separate oral agreement (and that the written contract was not a complete integration) not because of the "relating to the subject matter" language, but rather because of the distinct circumstances surrounding a separate oral contract. Plaintiff in *Hartbarger* was the former manager of defendant, who negotiated a severance agreement that barred him from competition with his former employer. Between the negotiation of that written agreement and its execution (delayed by defendant's attorney), plaintiff had acquired several competing businesses, and defendant agreed orally to purchase those competitors from him. Affirming a jury verdict in plaintiff's favor on that oral agreement, the court noted that the written agreement referred "solely to compensation and benefits due plaintiff as an *employee* of defendant," *Id.* at 1010, 558 N.E.2d at 602. The oral side agreement related to compensation of plaintiff for the purchase of businesses he acquired during the negotiation of the written deal. Indeed, the court noted, had that written termination agreement "been completed as originally planned, plaintiff would not have formed and acquired these new business ventures which were in direct competition with defendant, and there would have been no need to pay plaintiff an additional $200,000." *Hartbarger*, 200 Ill. App. 3d at 1011-12, 558 N.E.2d at 603.

In this case, Capital One seeks to admit extrinsic evidence of contractual provisions that are not only related to the subject matter of the contract as a whole, but would alter or refine the meaning of existing contractual provisions. In contrast, *Hartbarger* involved extrinsic evidence of an entirely separate oral contract. To the extent that the court based its decision on the presence

19

of "relating to the subject matter hereof" in the integration clause, the significance of such a clause is limited to situations where the extrinsic evidence offered relates to different subject matter than the original written contract.

As an alternative basis for the introduction of extrinsic evidence, Capital One next asserts that the Agreement is incomplete on its face. In support of this argument, Capital One notes that the Agreement lacks provisions dealing with choice of law, the qualifications of Committee members, or the resolution of disputes over how to spend the Annual Marketing Amount. Citing these omissions, Capital One declares the Agreement to be "obviously incomplete." (Appellants' Brief, at 30.) Capital One fails to cite any authority for the proposition that the absence of such detail renders a contract facially incomplete. The sole case cited by Capital One, *Air Conditioning Corp. v. Honaker*, 296 Ill. App. 221, 16 N.E.2d 153 (1st Dist. 1938), dates back to 1938, where an Illinois court held that a contract failing to define the term "air conditioner" was incomplete. The court was concerned about the term "aircondition," which was in the court's estimation, "a comparatively new word." 296 Ill. App. at 223, 16 N.E. 2d at 154. Given this novelty and the fact that the contract did not define the term, the court held that without oral evidence, it would be unable to determine the parties' intentions with respect to installation or service of air conditioning equipment for which defendant had refused to pay. *Id.* Capital One fails to point to any such major omission in the Agreement at present, nor does it cite any case law suggesting that the relatively minor omissions it has identified render the Agreement unenforceable or unintelligible.

Kmart urges that even if the bankruptcy court had erred in precluding the admission of extrinsic evidence, Capital One fails to present any evidence that Kmart's store closures and diminished market presence frustrated the purpose of the Agreement. Capital One insists that the

20

extrinsic evidence shows that Kmart's market position was the "very essence of the Agreement," citing testimony by one of its employees that Capital One would not have entered into the specific terms of the Agreement "with even slight variances" from Kmart's original market position. (Appellant's Brief, at 30-31.) In rejecting this argument, the bankruptcy court cited the two-part test of commercial frustration set out in *Illinois-American Water Co. v. City of Peoria*, 332 Ill. App. 3d 1098, 1106, 774 N.E.2d 383, 390-91 (3d Dist. 2002). (E.R. at 647-48.) The test requires that the frustrating event (1) not have been reasonably foreseeable and (2) effect an almost total destruction of the value of the contract. (*Id.*) The court concluded that the decline in Kmart's market position failed both prongs of the test. Such a decline was reasonably foreseeable; moreover, "there was no evidence that the reduction in the number of stores totally or almost totally destroyed the parties ability to perform under the Agreement." (E.R. at 648.)

Capital One acknowledges that an increase or decrease in the number of stores by Kmart would be foreseeable, but argues that the mass closure of over 600 stores, representing more than one in four of the chain's outlets, was not reasonably foreseeable. Responding to the bankruptcy court's comment about the absence of evidence on this issue, Capital One attempts to shift the burden of proof, stating: "there was no testimony or evidence that Capital One or Kmart had any reason to believe that Kmart would, in fact, decline so quickly and so drastically." (Appellants' Reply Brief, at 23.) The fact that neither party had any reason to expect a decline does not render such closures unforeseeable, however.

In any event, a finding of commercial frustration requires that the changes render the value of the contract totally or nearly totally destroyed. *Illinois-American Water Co.*, 332 Ill. App. 3d at 1106, 774 N.E.2d at 390-91. Capital One cannot show that the store closures effected an almost

21

total destruction of the Agreement's value. Although Kmart's market presence declined abruptly, the company remained, as of the time of the hearing, one of the largest retailers in the country.[11] As Kmart notes in its brief, "whatever the term 'mass merchandiser' may mean, that term plainly and indisputably applies to Kmart." (Appellee's Brief, at 7.) At best, Capital One presents evidence that the stores closures made the Agreement less profitable than it had hoped. The courts have made clear that the frustration of purpose doctrine "is not to be applied liberally." *Smith v. Roberts*, 54 Ill. App. 3d 910, 913, 370 N.E.2d 271, 273 (4th Dist. 1977) (citation omitted). Indeed, in general, a decline in profitability is insufficient to excuse contractual performance under the commercial frustration doctrine. *See* Restatement (Second) of Contracts § 261, comment b ("The continuation of existing market conditions and of the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial instability do not usually effect discharge . . . ."). *See also Long Grove Country Club Estates, Inc. v. Anderson*, 47 Ill. App. 3d 449, 457, 362 N.E.2d 374, 380 (2d Dist. 1977) ("while the record supports the general proposition that the developer's costs would be increased, and thus his profits might decrease, it certainly does not support a finding of hardship rising to the level of commercial frustration."). Rather, the frustration doctrine is limited to those cases in which, due to an event not reasonably foreseeable, the value of the contract is almost completely destroyed to one or both parties.

---

[11] In the fiscal year ending January 2003, Kmart had approximately $25 billion in sales. (E.R. at 130.) The retailer employees about 170,000 people and has over 140 million square feet of retail space. (*Id.*) As of August 2003, during the bankruptcy hearing, Kmart retained stores within 15 miles of 75% of the United States population. (*Id.* at 128-29.)

Capital One has failed to show that anything more than the profitability of the Agreement will be affected by the store closures. This alone is insufficient to support a finding of commercial frustration.

## IV.    Committee Membership Qualifications

In addition to its arguments about Kmart's status as a "mass merchandiser," Capital One contends Kmart breached the Agreement by replacing its original Committee representatives with inexperienced and unqualified personnel. Judge Sonderby rejected this argument, as well, concluding that the Agreement imposed no implicit or explicit criteria for membership on the Committees. Capital One, again, challenges the bankruptcy court's application of the parol evidence rule to exclude extrinsic evidence that, in its view, shows that both Kmart and Capital One had an unwritten understanding as to the minimum qualifications of the members of the Committees. Capital One contends that, in making these appointments, Kmart violated the implied covenant of good faith and fair dealing. Finally, Capital One disputes the bankruptcy court's conclusion that, even if Kmart had violated the Agreement in making these appointments, the defaults are curable and that Kmart "may arguably have cured already" by actively seeking to hire someone with credit card experience to serve on the Committees.

Capital One's claim of default is based on section 2.6 of the Agreement, which explains the purpose and composition of the Executive Committee and Management Team. Section 2.6(b) lays out the composition of the Executive Committee:

> The parties will appoint an executive committee which will oversee and direct the activities of the parties with respect to the Program in accordance with this Agreement (the "Executive Committee"). The parties will jointly select the individuals who will constitute the initial Executive Committee. Either party may remove or replace, with or without cause,

23

any member of the Executive Committee appointed by such party by delivering written notice of such removal to the other party.

(E.R. at 461.) The section continues with an explanation of the responsibilities of the Executive Committee, which include: (1) coordination and review of the business relationship between Kmart and Capital One, (2) the exercise of general oversight and periodic review of the credit card program, (3) review and recommendation of market plans and strategies, (4) facilitation of communication between the parties, and (5) resolution of any disputes between the parties. (Id.) Section 2.6(c) explains that "[t]he parties will appoint a management team consisting of those individuals that either party, from time to time, deems necessary for the successful operation of the Program." (E.R. at 462.) Among the responsibilities spelled out for the Management Team are: (1) day-to-day operation of the program, (2) review and presentation of results to the Executive Committee, and (3) development of annual marketing plans to present to the Executive Committee. (Id.)

By its terms, section 2.6 contains no qualifications or criteria for membership on the Committees. Capital One nevertheless contends that "certain qualifications for membership on the committees were implicit in the agreement based upon the parties' discussions and applicable law." (Appellants' Brief, at 31.) As discussed above, however, the court agrees with the bankruptcy court that the Agreement is a complete integration of the parties' understandings and that the parol evidence and "four corners" rules bar the admission of extrinsic evidence as to the meaning of the contract. Without such evidence, Capital One is left with the express terms of the Agreement, which as previously noted, contain no membership qualifications. To get around this hurdle, Capital One again invokes the implied covenant of good faith and fair dealing, but because it failed to raise this theory of default in either its original Objection to the assumption or in the bankruptcy hearing,

24

the court deems the argument waived. *See Teumer v. General Motors Corp.*, 34 F.3d 542, 546 (7th Cir. 1994) (citations omitted).

Even if Capital One had established a default relating to Committee staffing, the bankruptcy court concluded that the default is curable under section 365(b). Under that section, the debtor may assume an executory contract so long as it "cures, or provides adequate assurance that the trustee will promptly cure, such default." *Id.* The bankruptcy court held that Kmart's attempts to hire personnel with credit card experience to serve on the Management Committee may represent an adequate cure under Code section 365(b). (E.R. at 658-59.)

Capital One disputes this conclusion, as well, urging that "although it may be that Kmart could have cured its Section 2.6 defaults if it had acted swiftly and intelligently, it is too late for it to do so now even if it showed any inclination in that direction." (Appellants' Brief, at 35.) Furthermore, Capital One contends that "there is little evidence that Kmart yet knows what it needs to do [to cure]." (Appellants' Reply Brief, at 19. Notably, however, Capital One itself has not explained specifically how Kmart's committee representatives have failed to meet any particular requirements imposed by the Agreement. Capital One asserts without explanation that Kmart's efforts to cure this purported default are too late and that "[o]pportunities to capitalize on the Agreement for a significant period are gone forever." (Appellants' Reply Brief, at 18.) Again, however, Capital One has not at any point explained, in any detail, how Kmart's representatives were unqualified, nor how its relationship with Kmart would have been different had Kmart had different personnel been appointed to the Committees.

Whether the parties' Agreement will be productive and profitable in the future is, of course, an open question. The court is not prepared to conclude, however, that prior difficulties are

25

insurmountable. As the bankruptcy court noted, Capital One conceded during the hearing that it wants to see the business relationship continue. (E.R. at 659.) Kmart likewise stated that it considers the relationship an "indisputably" important one. (*Id.*) In any event, Kmart's right to assume the credit card contract under the bankruptcy code is not dependent on a guarantee that the venture will be a success.

## CONCLUSION

Neither party stipulated to any specific store volume or project staffing requirements, and parole evidence is not admissible to impose such requirements. Capital One failed to present sufficient evidence that Kmart has defaulted under the Agreement. The decision of the bankruptcy court is affirmed.

ENTER:

Dated: January 24, 2005

REBECCA R. PALLMEYER
United States District Judge